

# NUMBER 13-23-00583-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF Z.K.R., A CHILD

## ON APPEAL FROM THE 135TH DISTRICT COURT
## OF VICTORIA, COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña**
**Memorandum Opinion by Justice Longoria**

Appellant C.R. (Mother) appeals a judgment terminating her parental rights to her child Z.K.R.[1] Mother argues that the evidence is insufficient to support: (1) the statutory termination grounds, and (2) that termination was in the child's best interest. We affirm.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, parents and children are referred to by their initials or an alias. *See* TEX. FAM. CODE ANN. § 109.002(d).

## I.     BACKGROUND

### A.     Pretrial Proceedings

Mother has six children, including Z.K.R., who was four years old at the time of trial. According to the affidavit in support of emergency removal, on May 30, 2022, appellee, the Department of Family and Protective Services (the Department), received a referral stating that Z.K.R. was in the hospital having sustained second degree burns to his feet and ankles, burns to the back of his legs, bruising to his body and face, and "first degree burns to his genital[s] with suspicious bruising to his shoulders and back." The following day, Department Investigator Jazzmion Owens met with Mother at the hospital where Z.K.R. was med-flighted to for care. According to the affidavit, Mother informed Owens that Z.K.R. was not in Mother's care when he sustained his injuries, and that Mother's cousin D.L. was babysitting at the time. Mother confirmed that her parental rights to her four older children were terminated due to her history of drug use. The affidavit stated that Mother was aware that D.L. had a history of child abuse and drug abuse. Special Investigator Monica Cervera spoke with Z.K.R.'s maternal grandmother, S.M., at the hospital and was informed that Z.K.R. was with D.L. beginning Thursday May 26, 2022 and was returned to Mother's care on Monday May 30, 2022, after having sustained his injuries. Cervera also spoke with Mother, who informed her that she did not know where D.L. lived, or where Z.K.R. slept or how he was cared for when he was with D.L. Mother admitted to methamphetamine use. After the long weekend D.L. returned Z.K.R. to Mother and informed her that Z.K.R. had been burned in the bath. A.R., the alleged

2

father,[2] informed Holly Hamilton, a Department caseworker, that he told Mother not to "let [D.L.] have his son" because of how Z.K.R. responded when near D.L., which he described as "screaming like he saw a boogie man."

On June 2, 2022, D.L. was interviewed by Hamilton at the Victoria County Sheriff's Office after having been detained on a drug charge. D.L. informed Hamilton that Z.K.R sustained his burns in the bath, explaining that she left Z.K.R. alone for "five to [ten] minutes" and she heard him scream. When she went to check on him, the hot water was on. The Department affidavit stated:

> [D.L.] stated the bathtub faucet was turned down and to the left which indicated that the hot water was on. She reported he would not come to her. He was sitting in water that was up to his naval. She made him stand and she took him to her bed. While enroute to the bed, [Z.K.R.] hit his head on the doorframe causing a red mark to his left temple area. She denies knowledge of any other bruising. [D.L.] stated she observed blisters to form after 2-3 minutes. She would pop the blisters and then apply peroxide and a spray on antibiotic. At 1:00 am she checked him again. More blisters had formed, and she popped those and repeated the same treatment with peroxide and spray on antibiotic. [D.L.] stated she returned the child home to [Mother] on Monday, May 30, 2022[,] at roughly 11 am. She advised the mother that the child had been burned and to "put cream on it."

D.L. also admitted to a prior criminal history involving selling drugs. She stated she also gave Mother drugs, including "methamphetamines and Xanax whenever" Mother asked for them.

The Department received a forensic assessment from Center for Miracles which concluded that Z.K.R.'s injuries "provide[d] substantial evidence of physical abuse" and

---

[2] Mother indicated that there were two men who could possibly be Z.K.R.'s father, one of which was A.R., the father of her four older children. Subsequent DNA testing confirmed that A.R. was not Z.K.R.'s father. The other possible father is deceased, and no DNA testing was performed to determine if he was Z.K.R.'s father.

"concern for medical neglect due to his poor dentition." The hospital's social worker, Robyn Gambrel, also informed the Department that Mother "will let patient cry in the bed while she sleeps on the couch," "Mother didn't feed patient dinner" after Z.K.R. told her he was hungry, and Mother left Z.K.R. in soiled diapers, informing the nurses that she did not know how to change him.

Given Mother's prior history with the Department, her consistent drug use, and the injuries sustained by Z.K.R. as well as the reports from the forensic assessment and Gambrel, the Department sought removal and temporary managing conservatorship of Z.K.R. alleging "physical abuse and danger to the health and safety of the child," which was granted by the trial court. Temporary orders were put into place regarding Mother's visitation. Subsequently, a family plan of service was created for Mother and was adopted by order of the court.

**B.      Trial Record**

Cervera testified that she was sent to the hospital regarding a child, Z.K.R., as to whom the Department had received allegations of physical abuse and neglectful supervision. When she met with Mother at the hospital, Mother stated that Z.K.R. had been in the care of D.L. from Thursday until Monday and had sustained the injuries when he was with D.L. Mother did not have an address for D.L. nor did she know anything about D.L.'s residence. Mother admitted to Cervera that she had used methamphetamine "at least three days before the incident" and had been using methamphetamine for approximately one year. Cervera further explained that Mother did not immediately bring Z.K.R. to the hospital when D.L. returned him to Mother. Mother explained to Cervera that

4

she waited for transportation and "didn't want to call 911." Cervera stated that Mother informed her that when Z.K.R. was returned to her care, she saw his burns on his feet, but did not notice the additional burns and bruising. Cervera also met with Z.K.R. while he was in the hospital. She took photographs of his injuries which were admitted into evidence. The photographs depict the severe burns, bruises, and injuries on Z.K.R.'s body.

Cervera explained that Mother was uncertain who Z.K.R.'s father was, stating that there were two potential men who could have been his father—A.R., the father of her other children, or another man who had died in prison. When she spoke to A.R., he told Cervera that he had told Mother not to let D.L. take care of Z.K.R. because Z.K.R. was not comfortable with D.L.

Hamilton testified that, as the Department investigator assigned to the case, she received a report of the allegations involving Z.K.R.'s injuries. Hamilton explained that Mother had four children prior to Z.K.R. who had all been removed from her care with her rights terminated. She was able to speak with A.R. and D.L. during her investigation. Through her investigation, Hamilton learned that D.L. had an "extensive criminal history" which included assault and drug charges. D.L. also had history with the Department, having had her own children removed. At the time of Hamilton's investigation, D.L. had been arrested for manufacture and delivery of drugs. When Hamilton met with D.L. in the county jail, D.L. explained that Z.K.R. "caused [the injuries] to himself when he had turned the hot water on in the bathtub." As to the mark on his head, D.L. explained that "when she picked him up out of the bathtub and was carrying him," she "accidentally struck his

5

head on the door frame." She did not seek medical attention for Z.K.R.; instead, she attempted to treat the injuries herself by popping the blisters and using peroxide to clean the wounds and burn spray. D.L. also informed Hamilton that she would provide drugs to Mother, Mother would use drugs when Z.K.R. was home and she had seen drugs in Mother's home.

Mother was drug tested during the course of Hamilton's investigation and was positive for methamphetamine and amphetamines. Hamilton observed that Mother was inattentive to Z.K.R. at the hospital, not feeding him when he was hungry and stating she did not know how to change his diaper when it was dirty. Hamilton attempted to place Z.K.R. with family, but neither A.R., A.R.'s mother, nor Mother's uncle could care for him. No additional family members were offered as options. At the conclusion of her investigation, D.L. was "validated for medical neglect and physical abuse" and Mother was "validated for neglectful supervision."

Jennifer Garcia, the permanency specialist assigned to the case, testified that DNA testing ruled out A.R. as the father of Z.K.R. B.M. was the other potential father, but he was deceased when the investigation was ongoing. At the time of trial, Garcia testified that paternity was unknown. When Garcia was assigned to the case, there was a family plan of service put in place for Mother, which was adopted by order of the trial court. As part of her service plan, Mother was required to: complete parenting classes, complete a drug and alcohol assessment and follow all recommendations thereafter, undergo a psychological evaluation and follow all recommendations thereafter, and attend counseling. Garcia explained that the barriers to reunification at the time included

6

Mother's minimal participation in her service plan at the outset of the case and Mother's subsequent incarceration. Mother entered a Substance Abuse Felony Offender Program (SAFP), as ordered by the court after violation of her probation. Prior to going into the SAFP, Mother "completed a psychological evaluation" and "completed a drug and alcohol assessment." As a result of her psychological evaluation, it was recommended that Mother attend counseling, substance abuse treatment, and parenting classes. Mother did not follow those recommendations. While several drug tests were requested, Mother only completed three drug tests, two of which were hair follicle tests which returned positive for methamphetamine. When asked about what efforts were made to get Mother to comply with her service plan, Garcia stated:

> There [were] several referrals sent for a drug and alcohol assessment, which she did complete in February of 2023. There was multiple drug tests requested. She was told that parenting was held every Thursday at Mid-Coast. She agreed several times to go in for that parenting class and she never did so. There [were] also referrals sent in to counseling at Jill O'Neill's office here in Victoria. She was supposed to call them for scheduling, which she never did. She was also offered transportation to visitation[,] and she did not show up to many of those visits either.

Garcia stated that Mother would have benefitted from the parenting classes because Mother had a history of neglectful supervision with her older children, and she admitted she did not know how to fully care for her own children. Garcia opined that Mother would have also benefitted from the recommended individual counseling as Mother reported a history of depression and bipolar disorder, as well as an admitted issue with substance abuse. Garcia testified that after Z.K.R. was removed from Mother's care, Mother was still using drugs, even while pregnant with her sixth child. She did not follow through with her service plan, nor did she make any efforts to change her behaviors, until

7

she was incarcerated. Mother had another child after Z.K.R.'s removal who is also the subject of a separate Department case. That child is currently placed alongside Z.K.R. Garcia explained that there were "no appropriate family members given by [Mother]." She also confirmed that Mother mentioned two potential relatives, S.M. and M.M., the mother and sister of the deceased potential father, B.M. Garcia stated that she was not given contact information for those individuals, but that Mother stated she would have them contact her. She did not hear from them until long after Z.K.R. was placed in his current foster home. While S.M. and M.M. were informed that they could do an at-home DNA test, Garcia stated they did not follow through with that. Garcia did not believe placing Z.K.R. with S.M. and M.M. was in his best interest.

Garcia testified that Z.K.R. suffered a lot of trauma and has had night terrors following visitation with Mother. Z.K.R. told his foster parents that his Mother hurt him and was "very mean to him." According to Garcia, Z.K.R. is fearful of Mother. Garcia did not believe that Z.K.R. could be safely reunified with Mother, in part because Mother allowed Z.K.R. to be babysat by someone "with extensive criminal history" and a history of neglect for her own children. As to Z.K.R.'s current placement, Garcia testified that all of his needs are being met. Z.K.R. is bonded to his foster family, he is in therapy and counseling, and is recovering well from his injuries. Garcia believed that Mother's rights should be terminated.

On cross-examination, Garcia confirmed that Mother had been participating in services since she entered the SAFP facility three months prior to trial. Garcia agreed the steps Mother is taking are good steps, but also noted that they are required by the facility.

8

Bria Hill, the mobile case aid who supervised visitation between Mother and Z.K.R., testified that Mother's visitation schedule was twice a month with Z.K.R., once face-to-face and once virtually. Hill stated that Mother "missed 80 percent of her visits" and did not attempt to reschedule them. Hill said that Mother attempted to make excuses for missing, such as being unaware that a visit was scheduled or that she did not "know what virtual meant." Hill transported Mother to one of her visits and stated that she was available to assist in transportation if Mother needed it.

Hill described one of the virtual visits between Mother and Z.K.R. as "concerning." She explained that Z.K.R. did not want to participate, that he was covering his ears with his hands and hiding under his blankets. Mother asked Z.K.R. what was wrong, but he did not respond to her. Z.K.R. generally did not want to participate in the visits and after visits, he would "rush to the vehicle to his foster dad." The visits never lasted the full hour, and Mother was often late. Based on her supervision of the interactions, Hill did not believe that Mother and Z.K.R. were bonded. Of the "maybe four" visits that occurred, only the one she described "caused her concern." During the visit that caused her concern, Z.K.R. seemed to be fearful and his fear was visible in the other visits as well.

Susan White, the court-appointed special advocate (CASA) for Z.K.R., testified that Z.K.R. is doing very well in his placement. He attends play therapy and counseling. White explained that Z.K.R. has voiced his desire to stay with his foster parents. His youngest sibling is placed with him in the same home. Z.K.R. has an established, "safe, stable[,] and appropriate" routine in his current home. White stated that she believes that the current placement can meet Z.K.R.'s needs now and in the future. As the CASA

9

advocate, she stated she believed it would be best to terminate Mother's rights because Z.K.R. is "scared to death" to be with Mother and she believes that it would be detrimental to Z.K.R. to return to Mother's care.

White did not see any changes in Mother's behavior prior to going to the SAFP facility. Mother had not "acknowledged her role in this case" as it related to Z.K.R.'s injuries. White was concerned for Z.K.R.'s mental and physical health and safety in Mother's care. White also observed the virtual visits with Mother and stated that there was no engagement and that Z.K.R. would "holler [']no, no, no, no, no.[']"

Mother testified that D.L. had been babysitting Z.K.R. over the long weekend. She said D.L. had previously watched Z.K.R. and returned him with no injuries. Mother testified that, when Z.K.R. came home with the burns and bruises, "my mom and them rushed to the house and we immediately took him to the hospital." Mother admitted that the weekend Z.K.R. was injured, she was "using at the time and [she] didn't want to use around [Z.K.R.]." At the time of trial, she had been in the SAFP facility for three months, with six more months to complete. While in SAFP, she began participating in several groups. Mother testified:

> I'm participating in Good Intentions, Bad Choices, which is good ways of thinking and no bad choices in life. I'm also participating in Living in Balance. It's about living in, it's about living and doing the right thing in the right way. I'm also participating in Alcohol and Drug and the Brain. It's, alcohol messes up the brain. I'm also participating in Orientation, which is slips and how to do things around in the dorm and how to become a big sister and a good peer at work.

> I'm also participating in Cognitive Intervention. Also anger management, taking an action for the things I'm doing wrong and, Counter Group, we pull each other up on our negative behaviors. Process Group, open up and let it all out instead of holding it all in.

She also attended narcotics and alcoholics anonymous meetings. She was required to participate in four groups a day. She was also on the list to attend parenting classes in the month following trial. Mother stated that she intended to continue the classes even after her release from the facility. Once released from the facility, Mother will reside in a halfway house for two months. She explained that, after that, she "want[s her] kids back" and to "be the best mother [she] can for [her] boys." She stated that she is aware of the bad choices she has made that led to this case, and that she is trying not to make bad choices anymore.

Mother explained that D.L. is no longer part of her life and that she intends to surround herself with better people when she is released. She intends to find a job and a "good day care for the kids." She explained that her plan was for Z.K.R. to reside with B.M.'s mother and sister until she was released. Mother testified that she gave the information for these individuals to the Department, but that the Department did not contact them. She also stated that Z.K.R. knows them and is comfortable with them, and that they were not strangers.

Mother testified that she has six children, including Z.K.R., and that her rights were terminated as to her four older children because of her drug use. Her brother adopted three of her older children, but her oldest was removed from her brother's care because the child was "acting out." She explained that the oldest child "[i]s in Houston somewhere." Mother explained that D.L. had previously babysat Z.K.R. without incident and that she was unaware of D.L.'s own history with the Department. She did admit that she was aware that D.L. had been accused of beating her own children.

11

Mother disagreed with the characterization of how she behaved in the hospital, explaining that she fed her son when he was hungry, but that he had trouble eating because of his injuries. She stated she kept him safe in the bed and stayed by his side the whole time. She agreed that if he had not been left with D.L., Z.K.R. would not have suffered the injuries he sustained. She also stated that she knew her drug use caused her to leave him with D.L. and she "never knew [D.L.] was going to do something like that to [Z.K.R.]."

Mother admitted that D.L. had provided drugs to her in the past, specifically Xanax. She also admitted that she was ordered to participate in SAFP because she violated her probation. She explained that she did not work on her service plan prior to being ordered into the SAFP because she "was going through some things" and she felt "shocked." She admitted to having used drugs while pregnant with Z.K.R.'s younger sibling, but she could not state whether the baby tested positive for drugs at birth. She stated that she did not want her rights terminated because she "deserve[s] another chance." She admitted that her drug use was wrong, but she did not believe she endangered Z.K.R.

At the conclusion of the evidence, the trial court granted the Department's petition and signed an order terminating Mother's rights. *See* TEX. FAM. CODE ANN. § 161.001(b)(D), (E), (O), & (P). This appeal followed.

## II.     SUFFICIENCY OF THE EVIDENCE

In Mother's sole issue she contends that the evidence failed to support each termination ground and that the evidence was insufficient to support the trial court's best-interest finding.

12

## A. Standard of Review & Applicable Law

"Because the natural right between a parent and his child is one of constitutional dimensions, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), termination proceedings must be strictly scrutinized." *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). Due process requires that parental termination be supported by clear and convincing evidence. *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014); *In re K.M.L.*, 443 S.W.3d at 112. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). To terminate parental rights, a court must find one of the grounds for termination specified in § 161.001(b)(1) of the family code and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1), (2).

In our legal sufficiency analysis, we must view the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *In re J.F.C.*, 96 S.W.3d at 266). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is

13

true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of [§] 161.001[(b)](1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.— Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002)). Under this standard, we consider whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266. If we conclude that "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B.  Statutory Grounds

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232–33 (Tex. 2019) (per curiam). The Texas Supreme Court has held that, regardless of whether other grounds for termination are unchallenged on appeal, an appellate court must always review issues alleging the evidence was insufficient to support findings of endangerment under parts (D) or (E) of family code § 161.001(b)(1). *In re N.G.*, 577 S.W.3d at 234, 237 (holding that "due process and due course of law

14

requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights" on endangerment grounds because an endangerment finding "becomes a basis to terminate that parent's rights to other children" under § 161.001(b)(1)(M)). Therefore, we will first address the sufficiency of the evidence supporting the trial court's (D) & (E) findings.

Subsection 161.001(b)(1)(D) allows termination when the evidence proves by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," and subsection 161.001(b)(1)(E) allows termination if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). "Subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E)". *In re A.L.H.*, 624 S.W.3d 47, 56 (Tex. App.—El Paso 2021, no pet.) (quoting *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.)). Subsection (D) permits termination based on only a single act or omission. *In re V.A.*, 598 S.W.3d 317, 329 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). In contrast, subsection (E) requires evidence of a "voluntary, deliberate, and conscious course of conduct by the parent" and generally more than a single act or omission. *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

"For both of these provisions, 'endanger' means 'to expose to loss or injury; to

15

jeopardize.'" *Id.* (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "It is enough if the youth is exposed to loss or injury or his physical or emotional well-being is jeopardized." *Id.* (quoting *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.)). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well[-]being of a child." *In re S.A.*, 665 S.W.3d 59, 70 (Tex. App.—Tyler 2022, pet. denied) (first citing *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); and then citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc)). "Because the inquiry under both subsections D and E includes the conduct of the parent, evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child." *Id.* at 360–61 (citing *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.)).

16

The trial court's subsection (D) and (E) findings are adequately supported by the evidence in the record. The record shows that Mother has been struggling with drug addiction for years. Mother was in a court-ordered treatment facility at the time of trial and she had previously had her rights terminated to her four older children because of her drug abuse. *See In re J.O.A.*, 283 S.W.3d at 345. There was also evidence that Mother continued her drug use after Z.K.R.'s removal, having had positive drug tests and by her own admission. *See In re S.R.,* 452 S.W.3d at 361.

The Department's caseworkers also testified about their concerns that Mother was not participating in her court-ordered services until her placement in the SAFP. A parent's efforts to improve or enhance parenting skills are relevant in determining whether a parent's conduct results in endangerment under subsection (E). *See In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied). Further, the evidence before the trial court showed that Mother made the decision to spend a long weekend using methamphetamines instead of caring for her child. Mother chose to allow D.L. to babysit Z.K.R. while Mother was using drugs. By Mother's own admission, she was aware that D.L. had a history of abusing her own children, yet Mother allowed Z.K.R. to remain in D.L.'s care for a period of several days, without checking on his well-being. *See In re J.O.A.*, 283 S.W.3d at 345.

Considering the entire record, including evidence both supporting and contradicting the trial court's findings, we conclude that the contrary evidence is not so overwhelming as to undermine the court's finding that Mother both engaged in conduct that endangered her children's physical or emotional well-being and knowingly placed or

17

knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *In re J.F.C.*, 96 S.W.3d at 261, 266. Because the evidence is legally and factually sufficient to support both grounds, we need not address the sufficiency of the evidence supporting the remaining grounds. *See In re N.G.*, 577 S.W.3d at 232–33; TEX. R. APP. P. 47.1. We overrule Mother's issue as it relates to the statutory grounds for termination.

## C.    Best Interest

Mother also argues that the evidence was insufficient to support the trial court's finding that termination was in Z.K.R.'s best interest. In reviewing a best interest finding, we consider, among other evidence, the non-exclusive *Holley* factors. *See In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.*

As to the first *Holley* factor, the Department's caseworkers and the CASA advocate testified that Z.K.R. was fearful of Mother during their visitations, refusing to participate and often hiding from her on virtual visits. Z.K.R. would say "no, no, no" when he saw

18

Mother and it was expressed that he was afraid to be returned to Mother. There was also evidence that Z.K.R. was bonded to his foster family, often rushing to the foster family after visits. In light of this testimony, this factor weighed in favor of the trial court's best interest finding.

As to the second *Holley* factor, there was some testimony that Z.K.R. attended play therapy and counseling and that his current placement met the needs of Z.K.R.'s routine and schedule. There was no testimony regarding Mother's ability to address Z.K.R.'s needs in the future, however, at the time of trial, Mother still had several months before she would be released from the SAFP and testified that she would then have to reside in a halfway home for a period of time before being able to meet the needs of Z.K.R. The trial court could have also considered the undisputed evidence regarding Mother's failure to maintain significant contact with Z.K.R. as well as her failure to participate in the court-ordered services required to secure reunification with him. *See In re J.J.O.*, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.) (finding that mother failed to regularly visit or maintain significant contact with child supported by legally and factually sufficient evidence when mother made only twelve visits during nine-month period); *M.C. v. Tex. Dep't of Fam. & Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.— El Paso 2009, pet. denied) (finding that mother failed to regularly visit or maintain significant contact with the child when she visited only six to eight times in one year); *see also In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied). The trial court could find from the evidence that this factor supports a best interest finding.

19

Regarding emotional and physical danger, the third *Holley* factor, Mother admitted to drug use including methamphetamines. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (noting that a parent's drug use supports a finding that termination is in the best interest of the child). While Mother tried to mitigate her drug abuse by trying to avoid using in front of Z.K.R., her drug use was persistent before and after removal until her court-ordered admission into SAFP, and it led to her placing the child with an unfit caregiver, which in turn led to the child's injuries. This factor also weighs in favor of the trial court's best interest finding.

As to Mother's parental abilities, her plans for Z.K.R., and the stability of a future home, Mother stated she would be enrolling in a parenting course while in the SAFP. However, Mother had not completed any services as of the time of trial relating to parenting courses. There was also testimony that Mother neglected Z.K.R.'s needs while he was in the hospital, including feeding him when he was hungry or changing his soiled diapers. Mother testified that she hoped to obtain employment, find a stable home, and enroll her son into a reputable daycare, but aside from these blanket assertions, there was no explanation of how she would manage to accomplish these tasks. In contrast, the Department presented ample evidence that Z.K.R. was thriving, happy, and well cared for in a foster home with his younger sibling. While the Department did not put on evidence regarding the adoption of Z.K.R. by the foster family, the Department established that he is in a positive home environment. These factors weigh in favor of the best interest finding.

Regarding the final two *Holley* factors, Mother did not offer a credible excuse for her behavior in caring for Z.K.R. While Mother attempted to place the blame for the

injuries solely on D.L., she acknowledged that she was aware, to some extent, of D.L.'s abusive nature and Mother chose to place her child in D.L.'s care so that she could spend a long weekend using methamphetamines. Mother had a history of drug abuse, leading to the removal and termination of her rights to her four older children, yet she continued to abuse methamphetamines even after the removal of Z.K.R. While it is undisputed that Mother did not directly cause the burn injuries to Z.K.R., Mother's history of drug use and carelessness for her child's well-being was affirmatively demonstrated in the record. The final two factors weigh in favor of the best interest finding.

Because the *Holley* factors in this case weigh in favor of termination, we conclude the evidence was legally and factually sufficient to support the trial court's finding, and we overrule Mother's issue as it relates to the best interest finding.

### III. CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
28th day of March, 2024.

21